Good morning, Your Honor. My name is David Acklin, and I will be arguing on behalf of Petitioner Sheldon Prasad along on the issues regarding the criminal matter, and my associate Deborah Jade Mondell will be arguing the issue regarding the asylum. Simply stated, the issue that I will be addressing is whether or not the petitioner is subject to removal after receiving the post-criminal relief that occurred back in July of 2006. My associate will be dealing with the issue as to whether or not the denial of the asylum by the immigration judge was supported by the evidence. Turning to the issue that I'm going to argue, the critical case in this matter is Chavez-Perez v. Ashcroft. And in that case, the petitioner had a situation where he had a criminal conviction for simple possession. He's put into proceedings. In order to qualify for his expungement, there was still a term of probation that needed to be completed before he could obtain that relief under the rehabilitative statute. And this Court decided that it was speculative as to whether or not he may commit a crime during that period of time and would even be eligible for the expungement. So therefore, the ruling of the Court was that he was removable. This case is distinguished by the fact that when the conviction was vacated and turned into a simple possession conviction that met all of the other three criteria, by the time that occurred, we now have a situation where the two years' probation has already passed. So the critical language in the fourth part of it will be dismissed after probation. There's no speculation here as to whether or not he's eligible for the expungement because the two years had already passed and there was no other criminal arrest or conviction of any type that would have made him ineligible for the expungement. And because he was in proceedings at the time and he's been detained for the last four years, that just never occurred because once the post-criminal relief was granted, we immediately filed a motion to remand with the BIA. And that's how we ended up here. So it seems to be a clear distinction. And again, there's no speculation as to whether or not he may be eligible or might not be eligible. The two years has already passed. There's no criminal record. Kennedy. The conviction was vacated, and immediately afterward, didn't he file a NOLA contendery plea? Well, that's correct. In California, that's a felony. That's a guilty to a felony. No, it was a misdemeanor. It was the actual.  That's correct. That's a felony. NOLA was a guilty plea to a felony. Jeff Baird, I was all about these things having a distinction as a. For my sins, I was down at the Hall of Justice for a while. So, I mean, if he's pleading guilty to a felony possession, that's a controlled substance offense. Why isn't that all we have to consider? Well, it was done. And afterwards, it wasn't vacated under a rehabilitation statute. That's true, because he was detained. But I think the issue. Your point is there was nothing to vacate under a rehabilitation statute because it was done as probation. Well, I think the issue is whether or not in the Chavez case, the issue was whether or not at some point in the future before he completed his probation, he would commit some crime that would make him ineligible to get the expungement. In this case, by the time the post-criminal relief was granted, the non-pro-tunk, the two-year period had already elapsed. In fact, now. I'll take a look at the Chavez case. Thank you very much. Thank you. I think you've got. And I'd like to reserve a minute for rebuttal. Good morning, Your Honors. May it please the Court. My name is Jade Mundell. I'm a petitioner along with David Acklin. The petitioners, the other element of this petition for review before the Court. You'll have to keep your voice up, please. Those mics are only for recording purposes. They do not amplify your voice. I will try. I'll do that. Sorry. The other element of the petition for review in the case with this petitioner is his application for asylum, withholding of removal, and relief under convention against torture. The petitioner is an individual who is originally from Fiji, claiming asylum. It was a discretionary denial on the part of the immigration judge, finding that he did not have facts that rose to the level of past persecution and did not. That's eligibility. But the IJ made a separate determination of that even if he were eligible, he would exercise discretion to deny him the relief. So the fact that you can show he's eligible doesn't help you any, but you have to show his almost insurmountable burden of showing there was an abuse of discretion. So we can assume that he was eligible. What good does it do you? Well, I think that there was a balancing of factors here, that I think that if the court, if the immigration judge, had properly assessed some of the facts in the case to have more weight and to have found a stronger case for past persecution and a basis for well-founded fear of future persecution. You're asking us to second-guess the discretion of the IJ, saying, well, if you sort of weighed things differently, if you sort of considered things differently. But he makes, he makes, this is what, all we can do is find on eligibility. Once the IJ says even if you're eligible, I'm not going to, I wouldn't grant asylum, why isn't that pretty much the end of the matter? If the Petitioner is going to, bless your honor, if the Petitioner is going to find that the probability is more likely than not that he's going to be harmed when he returns to Fiji. And I think that this discretionary decision on the part of the immigration judge in the instant case would be an abuse of discretion for not taking into consideration the future harm that's going to come to this Petitioner. If you could show that it's for withholding removal or relief under convention against torture, that those elements should outweigh and have a heavier factor, I mean, have a heavier weight in balancing against the discretionary decision. And I think that he was talking about asylum in that case. And even though he did make a discretionary denial, he didn't, I think that if he'd properly assess that the, that he is more likely than not to be persecuted if he returns to Fiji, given the totality of circumstances in this case, then that would have been an abuse of discretion. Okay. Fair enough. That's a good answer. So go ahead. Why, where do you think that the IJ goofed here on? Well, I think that the immigration judge failed to properly assess that, that the cumulative effects of all of the events that took place when Petitioner was a child, the harm to the animals, the slaughtering of animals on the grandfather's farm, the stoning of the house by the native Fijians, three break-ins at the house, Petitioner was present when Indian slurs and anti-Indian slurs were made, and that he even had to be present. I got the slurs part, but slurs are not nearly enough for persecution. But in the context of a child being present. Did you get my question? Slurs unto themselves may not, but in the, combined with something else. But slurs alone are not, right? Slurs alone would probably be discrimination. The incidents involving slurs involved no harm. Well. No physical harm. There was a robbery. There was harm to a structure, and there was a taking of items. So I think that there was, persecution can be emotional as well.  It doesn't necessarily have to be physical harm. There were incidents where there were slurs when he was a child. Correct. Did those involve robbery or damage to property? Yes. Well, taking of property and some vandalism of the home. I'm sorry? Vandalism of the home and taking of property from the home. He was confronted when they were with the babysitter, and the men broke in and took items and used Indian slurs. So in the context of that, it wasn't just Indian slurs unto itself. But no one was hurt. No one was hurt. Okay. And so what are the other incidents? I mean, that alone is not enough, right? Right. Okay. So what else have you got? The father had, the petitioner's father had 11 siblings. I think one of him died. Three have sought asylum and been granted asylum elsewhere in New Zealand, Canada, and Australia, I believe. One of his uncles. That doesn't help at all. One of his, well, the family is. We don't know what those statutes are like in New Zealand or Canada. I'm sorry, these other places. So we have no idea. And it wouldn't be visually caught in any way. The United States was not a party to those proceedings. That's true. So it doesn't really help any that they got asylum there. Well, there's a family of 10 siblings, many of whom were very well-known, including petitioner's father, who was high up in the government before he was displaced to be replaced by a Fijian native, basically through being pushed out of his position. He had an uncle who was a well-known radio announcer. Well, losing your job is not persecution. What have you got that shows persecution? What have you got? The uncle who's a radio announcer, he was arrested and taken into custody, and he was a Hindi radio announcer who would announce crimes and injustices against the Indians by native Fijians. And there was another uncle who was arrested and taken into custody. Every night they had stonings at their house. The native Fijians would terrorize them. The farm animals, even though that they were being killed, they put a fence around it, and they tried to chain up the animals. Then they would cut the animals' legs off so that they bled to death slowly. And every time they went to the police, the police said, nothing we can do. Every time they went to the local Fijian chiefs, the Fijian chiefs said, well, that's too bad. We want your land. So in the totality of circumstances. How do you connect those other incidents to his Indian status? Which incidents? The throwing of the rocks? Throwing of the rocks. They knew it was by the neighbors, and all of their neighbors were Fijian natives. So, I mean, they would come out of the house and see. They knew who was throwing the rocks at their house. Even the Fijian chief acknowledged the wrongdoings that were occurring. But they have different land property rules in Fiji and long-term leases, sort of like a British subject, real estate-based law. So they were trying to force them out to take over the Fijian leases. So I think the totality of circumstances, since it was always Fijian on Indo-Fijian crimes, that perhaps each individual was doing that. So let's say all of those are attributable, and we can sort of say that they're acts on account of their status. There was no physical injury, right? There was physical injury to the petitioner's father, not to the petitioner himself, because he was a child at the time. Tell me about that incident. The petitioner's father was a very well-known political activist for Indian rights, pro-Indian rights, Indo-Fijian. And in one of the new jobs that he had to take when he was pushed out of the old one, he was trying to work to, I think, expose fraud in the fights. What was the physical injury? He was attacked by other Fijian workers after they found out that he was reporting on them and trying to advocate pro-Indian rights in the workplace. What was the injury? I have to take that. I think he had a – he was physically beaten up, and I don't think he had any broken bones, but he had cuts and lacerations. He had to go to the hospital, stitches. We have cases that say that even if the government does that, that's not enough. I mean, we have cases saying that even if the government – even if, let's say, the police did this, and this wasn't the police. This was other groups. We have something imputed to the government. But we have cases that say that even if government officials do this, that's not enough, and even if it's done to the actual petitioner, here you have it one step removed. This is father. It's a very long time ago when he was a child. Right. And in England, there are no broken bones. There's no hospitalization. There's – I mean, we've held even more serious injuries than that that don't amount to persecution. I understand what the Court is saying, what Your Honor is saying. May I ask you a question? I'd like to interrupt because there's – I think there's a procedural problem here. We've been talking about eligibility for asylum with all the facts of persecution or non-facts of persecution. But the BIA says the – and then there was a specific discretionary denial here by the IJ. Yes. The BIA says the respondent does not specifically contest the immigration judge's denial of asylum as a matter of discretion, nor does the respondent explain why he warrants a favorable exercise of discretion. That sounds to me like you're barred for not having exhausted your remedies at the BIA. When we filed the appeal, we made all of the same arguments that we would make for past persecution and well-founded fear and more likely than not on the probability for withholding. So we made our arguments for asylum, withholding, and for relief under Convention Against Torture. The problem was that when we made a statement in the brief that it was erroneous as to why a negative decision had been made. There was one sentence in there to which as soon as that was discovered, we immediately filed a supplement to that brief and clarified that we are contesting the discretionary decision and that he does assert his eligibility for asylum. So that was filed immediately after to clarify that. So your position is that your brief before the BIA does indeed raise this issue. Correct. The BIA got it wrong. And after we filed that supplement to clarify exactly what that sentence that we were saying that we are clarifying, that we are, yes, I'm saying that the BIA got it wrong. And what was the reasons why you should get a favorable exercise of discretion? Because we know that those reasons against and for a favorable exercise of discretion are about seven or eight of them. I thought that the immigration judge was we believe he erred in exercising. Well, he exercises discretion against your client because of the prior meth conviction. Correct. Period. Correct. Why isn't that okay? When looking at the totality of circumstances that support the finding of past persecution and a possible well-founded fear of future and the likelihood of harm to this Petitioner that he would stand out as a target, unlike some of the other cases that have happened that have been decided before the Ninth Circuit recently where, with Lalonde, where she would have no reason to stand out, we believe that he will. And that under those circumstances and given the fact that his rehabilitation had been attested to by himself, by the Petitioner, and by his father, and the whole incident with the NyQuil with the probation violation, I just think the discretionary denial was an abuse in light of all of that. Thank you. Okay. Thank you very much. Thank you. I'd like to reserve any time we have remaining for rebuttal. You don't have any time left. No. Good morning. Excuse me. May it please the Court, Andrew Nsinga for the respondent to the Attorney General. After several hearings and motions, the agency found the Petitioner is ineligible for any benefit under the INA, and the record fully supports all those conclusions. As to the discretionary denial of asylum, the immigration judge made a very clear denial on that matter. In Petitioner's notice of appeal, the brief, nor the supplement, there was never mention of why that decision was in error. As counsel concedes, the first brief actually erroneously said it was denied because of statutory ineligibility. That statement was wrong. The supplemental brief mentions that it was denied as a matter of discretion, but presents no argument that it was an abuse of discretion for the immigration judge to do that. Accordingly, Petitioner forfeited the argument to the Board, and therefore, this Court is without jurisdiction to review that matter. The agency, in saying explicitly that Petitioner failed to raise the issue, but this Court, in its en banc decision in Abebe, explicitly said the Board can do. When Petitioner fails to raise an argument before it, it has an ability to say we are not going to address that argument, and that's exactly what the Board did in this case. Accordingly, Petitioner is not eligible for asylum, and this Court does not have jurisdiction to review that issue. Accordingly, the issues, the sole relief before this Court are withholding removal and protection under the Convention Against Torture. In this case, Petitioner has failed to show that the harm he suffered was substantially more grievous than general manifestations of hostility between competing groups. Petitioner was the – well, Petitioner's home was the victim of two random crimes. And I'd like to take a step back here and ask the Court to, of course, note that this Court has said that assertions and arguments of counsel are not facts and evidence. Petitioner's opening brief and reply brief does not cite the Petitioner's testimony. It does not cite the testimony of Petitioner's father. It does not cite to the asylum application. What it cites to is a brief written by an attorney to the immigration judge. So, for instance, this dramatic scene of men raiding the house and the babysitter being threatened with repercussions and these men throwing around anti-Indian slurs, that's not in the record. The asylum application says there are break-ins, the babysitter was threatened, period. Petitioner, when he testifies, doesn't even say he was even present, though the agency assumed he was present. He said he was there and there were, quote, a couple of break-ins. Counsel then asks him how much time existed between these two break-ins, and Petitioner says he did not know. No mention of slurs, no mention of, you know, threats to the babysitter for repercussions of going to the police. Those simply are not facts in the record. Accordingly, these are simply general lawlessness as insufficient for finding of past persecution. And at worst, it's a general manifestation of hostility between competing groups that under this Court's decision are the same, are insufficient. Accordingly, the record fully supports the agency's denial or finding that Petitioner did not suffer past persecution. Finally, Petitioner failed to demonstrate that the issues regarding his family do not demonstrate clear probability of persecution. This Court has said that acts of violence must create a pattern of persecution closely related to Petitioner. In this case, Petitioner's father testified the family was very well off in Fiji. They're doing well. He said, quote, they just wanted something better. That's not sufficient for asylum or, excuse me, for withholding removal or cat protection. The incidents that occurred to Petitioner's family were not persecution, let alone create they did not create a pattern of persecution closely tied to Petitioner. Again, the incident on the farm, for example, occurred in 1975. And again, I would note that in the reply brief, Petitioner claims that he witnessed this event. However, Petitioner was born in 1984, nine years later. So clearly, Petitioner did not witness this. The other incident was Petitioner's father, who was a government worker, being fired. This simply has no relation to Petitioner, nor does it have any relation to Petitioner's father's race, given that he testified that he was fired because he did not reveal, he refused to hide the corruption at both these jobs. And finally, with regards to the attack, first of all, there actually is no evidence in this record that the man who attacked Petitioner's father is native Fijian. I've searched that record, Your Honor, and as far as I've been able to tell, I've never found any evidence of that. What Petitioner's father says is this man attacked him because Petitioner's father somehow denied him a promotion. It had nothing to do with Petitioner's race, nor Petitioner's father's race. Accordingly, there is no pattern of persecution closely related to this. What about the rocks falling by the neighbors? Well, to the extent there's evidence of that in the record, that's not sufficient persecution, Your Honor. Moreover, it's not, doesn't demonstrate that Petitioner is likely to go back to be a sugar cane farmer, particularly in post-independence Fiji, and have to deal with these sorts of leasehold issues that have been resolved, according to the country report. The 2000 report states that these leasehold issues have been basically resolved. Okay. Thank you. Finally, I just would just briefly mention the ineligible cancellation, if I may. Petitioner is not eligible for a Federal First Offender Act treatment, period. This conviction is still a conviction. Petitioner did not have his conviction expunged. It's still a conviction. And the argument that somehow could be expunged or was expunged simply holds no water. I think the Court understands the difference between guilty, not guilty, and no contendering. And I would simply note, of course, that this Court's decision in Cuevas-Gaspar has no application in this case because Petitioner's father entered in 1998 as well. Say that again slowly. Petitioner's father entered in 1998 at the same time Petitioner entered the United States. Accordingly, there would be no time to impute to. What would that have to do? Oh, I see. Yeah. Petitioner and his father entered in 1998. But he wasn't a minor anyway, was he? He was a minor until he was a minor for a period of that time, Yes, Your Honor. A period. When he entered in the United States, I believe he was 14 or 15. Has the argument been made that you count his time and you add the time of the father? No. None of that argument has been raised, but I simply thought it should be noted, of course, that there would be no time to impute in this case. Accordingly, the government requests that the Petitioner for Review be denied. Thank you. Thank you. You are way out of time. Would you like to take a minute for a moment? Yes, Your Honor. One of you. Okay. Thank you. Very quickly, with regard to this issue about the conviction, if, in fact, he falls under the criteria for the Federal First Offender Act, that conviction would not render him removable. So the idea that somehow that's going to stop time for his application for legal permanent resident cancellation removal wouldn't even be applicable because he just wouldn't be removable and he would be released. And I just want to say, though, the whole thing that set into motion this catastrophic set of events for my client was over the weekend, he gets the flu, his parents give him some NyQuil, he goes for a drug test on Monday, and the drug test comes out dirty. And when that was presented to the court... But it started earlier when he committed the crime. I'm sorry? It started earlier, didn't it? The original crime did, but the original crime was just the summary probation. It would have fell under the Federal First Offender Act. But the sort of the NyQuil defense is always, you know, how do we know that he took NyQuil? Well, because when it was presented to the court... They always take NyQuil. Or they have a poppy seed bagel, you know, so it's one or the other. But the point was that caused a probation violation that set into motion the removal proceedings. But for the NyQuil and the dirty drug test, we wouldn't be standing here today. Yeah, but you're saying it's NyQuil. But how do we know it was NyQuil? Well, we know it's here during breakfast. Well, again, it's based on there was no testimony or evidence to the contrary. I'm sorry? There was no testimony or evidence ever to the contrary. So based on the testimony and the evidence, that's what it was. Pardon me. Wasn't he convicted of possession of methamphetamine? That's correct. How was that? Was that after a trial? It was not a trial, no. It was a... A guilty plea. That's correct. He wasn't charged with possession of NyQuil. That's correct. The NyQuil had to do with the probation violation which set into motion the deportation case. Thank you. Okay. Thank you. Nope. Time's up. Thank you. The case aside, we'll stand for a minute.
judges: Kozinski, Aldisert, Bea